592 So.2d 1016 (1992)
Marshall PICKARD
v.
Wayne P. TURNER, et al.
1900703.
Supreme Court of Alabama.
January 17, 1992.
Alexander W. Jones, Jr. and Madison W. O'Kelley, Jr. of Pritchard, McCall & Jones, Birmingham, for appellant.
James W. Garrett, Jr. of Rushton, Stakely, Johnston, & Garrett, P.A., Montgomery, for appellees.
ALMON, Justice.
Marshall Pickard filed a legal malpractice action against Wayne P. Turner, Terry P. Wilson, Thomas R. Christian, and Robert T.J. Childers, individually and as partners in the firm of Turner, Wilson, and Christian. Pickard claims that the defendants are liable under theories of negligence and fraud. Following the defendants' motion for summary judgment, the trial court entered judgment in their favor. Because Pickard introduced evidence that the defendants breached their duty to him, the dispositive issue is whether he presented substantial evidence that such a breach by the defendants proximately caused his alleged loss.
The facts in this case are complex, and the resolution of the issue presented requires a detailed analysis of the evidence. Therefore, we recite the following facts, based upon a thorough review of the record, viewing all the evidence in a light most favorable to Pickard, the nonmoving party:
During March 1984, Pickard purchased a 391-acre tract of land in Jefferson County, Alabama, for approximately $392,000. The land's appraised value was approximately $1,000,000. Pickard financed the transaction by mortgaging the land to First American Mortgage Company, Inc. ("First American"). *1017 In March 1984 First American lent Pickard 60% of the land's appraised value, approximately $600,000. Pickard paid for the land and kept the surplus loan proceeds.
Immediately following his purchase of the land Pickard began to try to sell the land. Because Pickard failed to make any of the payments due under his loan agreement, First American foreclosed on the mortgage in August 1984. Pursuant to Ala.Code 1975, § 6-5-230,[1] Pickard had until August 1985 to redeem the land. With his father's help, Pickard continued efforts to sell the land.
As the date for the expiration of his right of redemption approached, Pickard filed an action against First American to have the mortgage set aside. In June 1985, Pickard and First American settled the action, and the court entered judgment on the settlement. Under the terms of the settlement Pickard received an exclusive option to sell the land. This option was to exist until October 15, 1985. Pickard contends that First American attempted to avoid its settlement obligations and that, during negotiations in September 1985 over those obligations, his lawyer accepted an option that was worth less to him than the settlement's exclusive option to sell. Because Pickard's lawyer allegedly compromised Pickard's position without consulting him, he sought another lawyer for the purpose of filing a legal malpractice action. Pickard also wanted to have his exclusive option to sell the land extended. In late September 1985 or early October 1985, Pickard contacted Wayne Turner and discussed the possibility of filing a legal malpractice action and the possibility of having the exclusive option to sell extended.
During this time, Brooks Emory, a realtor, was looking for a 400-acre tract of land in Jefferson County. According to his deposition, he was looking for land for Waste Services of Birmingham, Inc. ("Waste Services"). Emory contacted William Murray. Murray, another real estate agent, was familiar with land in the area. Emory gave Murray the description of the kind of land that Waste Services wanted. According to Murray's deposition, he remembered having looked at Pickard's land several months earlier and thought that it might fit the description. Murray told Emory that he might be able to procure an option to purchase, if the land was still available. Murray and Emory agreed to work together and to split any difference between their purchase price and the price that Waste Services was willing to pay. Their arrangement was disclosed to Waste Services. Murray began to try to locate the land's owner.
In his search for the land's owner, Murray contacted another real estate agent, Jim Davis. Davis was also familiar with land in the Jefferson County area and had inspected Pickard's land with Murray earlier. Davis remembered the land and agreed to help Murray obtain an option to purchase. To compensate Davis for his help in obtaining the option, Murray agreed to split his share of the profits from the sale of the land to Waste Services.
On September 19, 1985, as a result of Davis and Murray's efforts, Pickard signed an option contract agreeing to sell the land for $630,000. When the document evidencing the option to purchase was prepared, "Murray M. Burns" was inserted as the name of the purchaser. According to both parties, this was a clerical error. At some time, Pickard corrected the clerical error by crossing out "Murray M. Burns," inserting "William Murray," and initialling these changes. All of this was done in Pickard's handwriting. Under the terms of the option, Pickard was initially paid $1,000. For the option to remain effective until October 14, 1985, an additional $9,000 had to be paid on or before September 30, 1985. This was not done, and the option lapsed.
In early October, Murray contacted Pickard's father and inquired as to whether the land could still be purchased for $630,000. On October 8, 1985, Pickard, Pickard's father, *1018 Murray, Davis, and Turner met to discuss the sale of the land. At the meeting, Pickard agreed to sell the land to Murray for $630,000. In his deposition, Pickard's father states that Murray's representation of a third party was mentioned at the meeting. At the meeting, Murray told Turner that someone would soon inform him of the name of the party that would be taking title to the land. Because a real estate closing would have to be accomplished within one week, Turner enlisted the aid of Terry Wilson. Wilson was one of Turner's law partners and was more experienced than Turner with real estate closings.
Shortly after the meeting, Pickard delivered the corrected option agreement and a handwritten note to Turner's office. The note read:
 "10/08/85
"Mr. Turner
"We delivered the letter to [my first lawyer]. He was in his conference room with clients, so we taped the letter to the office door. We will send him a copy certified mail also.
"Also, I corrected Mr. Murray's name and am sending you my original of my option contract with Mr. Murray. My R.E. Agent, Pam AusleyCKM Realty (870-8448) may call you tomorrow morning (Wed.) to confirm that I have initialed the changed name, if Mr. Murray requests her to.
"Will check with you late tomorrow morning, or you can call me c/o my father265-0511. Thanks for everything.

 "/s/ Marshall"
Pickard left another handwritten note at Turner's office that read as follows:
"PERSONAL AND CONFIDENTIAL
"Mr. Turner
"These are actual copies with copies of the certified receipts, of dad's letter of notice to First Americanand the ORIGINAL LETTER sent to us today by Jim Williams [First American's lawyer] acknowledging BOTH ACCEPTABILITY of the notice, as well as their willingness to close BEFORE the 15th. We want a full blown all out no holds barred hearing to ABATE the interest, if the Judge will hear us. Jim was much to [sic] nice in his letter. He thinks, we believe, we are bluffing, and may have something else surupticious [sic] up his sleeve. I expect that he will be very disappointed when you call him to inform him that we actually DO have a buyer and CAN close Monday.
"Please call us, or we'll call you prior to calling Mr. Williams.
 "Thanks,
 "/s/ Marshall"
On Friday, October 11, 1985, Waste Services' lawyer contacted Wilson and informed Wilson that Waste Services was to be the grantee. Wilson met with Waste Services' lawyer, and at this meeting Wilson learned that, immediately after purchasing the land from Pickard for $630,000, Murray planned to sell the land to Waste Services for $1,134,000.[2] According to the evidence in the record, this meeting on Friday afternoon was the earliest time that Turner or Wilson could have learned of the higher sales price to Waste Services.
In order to accomplish the conveyance of the land to Waste Services and avoid the expenses of a second title insurance policy and additional recording fees, Wilson and Waste Services' lawyer agreed that the closings should be consolidated, with Pickard executing a quitclaim deed to Waste Services and First American executing a statutory warranty deed to Waste Services. Waste Services would pay Pickard's obligation of $595,915.82 under the First American mortgage. Waste Services would also pay $296,084.18, from which the various closing costs, the different real estate agents' fees, and Pickard's profit would be paid. The consolidated closing also involved Murray's wholly-owned corporation, *1019 MYCA, Inc. MYCA served as the conduit through which Murray's transfers from Pickard and to Waste Services would pass. Under this arrangement, Pickard was receiving $630,000 for the land. After paying his obligation to First American and paying his share of the closing costs, Pickard received $12,704.22. On MYCA's sale of the land to Waste Services, Emory Realty, Inc., received $42,000. After paying for the land and paying its share of closing costs, MYCA received $220,293.00.[3]
On Saturday, October 12, 1985, during a brief meeting with Turner, Pickard became aware that Waste Services was to be the purchaser of the land. However, he still did not know the sales price. On Monday, October 14, 1985, Pickard went to the offices of a law firm in Birmingham and signed a quitclaim deed conveying his interest in the land to Waste Services. On Tuesday, October 15, 1985, Pickard's father went to Turner's office and signed the necessary closing documents as Pickard's agent. The real estate transaction was completed. While signing the closing documents Pickard's father discovered that MYCA was selling the land to Waste Services for $1,134,000. After signing the documents, Pickard's father informed Pickard of the sales price.
Because neither Turner nor Wilson disclosed to Pickard the details of the transaction between Murray, MYCA, and Waste Services, prior to the closing, Pickard filed this legal malpractice action against Turner and Wilson and their partners, individually and as partners in the law firm of Turner, Christian, and Wilson. Because Turner and Wilson's partners did not participate in the transaction, their liability can arise only through their partnership with Turner and Wilson. Pickard contends that Turner and Wilson were negligent in failing to disclose the details of the closing, including the involvement of MYCA and particularly the higher sales price to Waste Services. Pickard alleges that if this information had been disclosed to him, he would have been able to obtain a higher price for the land.
The parties engaged in discovery, which included deposing the fact witnesses and expert witnesses. Pickard's expert witnesses testified in depositions that, in their opinion, Turner and Wilson had a general duty to inform Pickard of the details of the closing transaction. The defendants' expert witnesses testified that Turner and Wilson did not breach any duty to Pickard and that, even if they did, Pickard suffered no injury caused by any such failure by Turner and Wilson to disclose all the facts as soon as they learned them. Based on the discovery materials, the defendants filed a motion for summary judgment. The trial court reviewed the record and entered judgment in the defendants' favor.
Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 56(c), A.R.Civ.P. In determining whether the moving party is entitled to a summary judgment, the trial court must view all of the evidence in the light most favorable to the nonmoving party. All reasonable doubts are to be resolved in favor of the nonmoving party. DuPont v. Yellow Cab Co. of Birmingham, 565 So.2d 190 (Ala. 1990); Kenai Oil & Gas, Inc. v. Grace Petroleum Corp., 512 So.2d 1347 (Ala. 1987). In reviewing a summary judgment, this Court applies the same standard as the trial court. Wright v. Robinson, 468 So.2d 94 (Ala.1985).
A plaintiff in a legal malpractice action must prove the same basic elements as in a negligence action: duty, breach, proximate cause, and damages. Moseley v. Lewis & Brackin, 533 So.2d 513, 515 (Ala. 1988). In addition to the traditional elements of a negligence action, the legal malpractice plaintiff must prove that the transaction would have had a different result if the alleged negligence had not occurred. Moseley, supra, at 515; Mylar v. Wilkinson, 435 So.2d 1237, 1239 (Ala.1983). As *1020 stated in 7A C.J.S. Attorney and Client § 255 at 462 (1980):
"Generally, actionable [legal] malpractice cannot be established in the absence of a showing that the attorney's wrongful conduct has deprived the client of something to which he would otherwise have been entitled."
Id. A lawyer cannot be expected to achieve impossible results for a client.
A similar rule exists in the law regarding fraud and misrepresentation. In Reeves v. Porter, 521 So.2d 963 (Ala.1988), this Court stated:
"A representation in an arm's length transaction that causes a person to do nothing more than he was legally obligated to do without such a representation being made, is not material and therefore cannot constitute actionable fraud. [Citations omitted.] In 37 Am. Jur.2d Fraud and Deceit, § 295, at 392-93 (1968), the following appears:

"`It is said to be immaterial that one is induced by false representations to do what he is bound to do. A person who has been induced to do that which the law would have otherwise required him to do cannot claim to have been defrauded. In other words, one suffers no damage where he is fraudulently induced to do something which he is under legal obligation to do, such as ... execute a deed which he has contracted to execute ... or perform a valid contract.'"

Id. at 967-68. (Emphasis supplied.) A person is not defrauded by representations made to him after his own agreement has legally obligated him to perform.
Pickard submitted deposition testimony of lawyers qualified as experts on the subject of real estate transactions. Although his experts' deposition testimony was contradicted by the deposition testimony submitted by the defendants, Pickard has presented, in opposition to the motion for summary judgment, substantial evidence that Turner and Wilson had a duty to disclose the information they received in handling the closing. Assuming that Pickard has shown such a duty and a breach of that duty, he must also show that Turner and/or Wilson's acts or omissions proximately caused his alleged injury. Richter v. Uhrig, 534 So.2d 260, 261 (Ala.1988); Tyree v. Hendrix, 480 So.2d 1176, 1177 (Ala.1985); Herston v. Whitesell, 348 So.2d 1054, 1057 (Ala.1977). If Pickard was legally bound to sell the land to Murray, Pickard cannot show that his ignorance of the higher sales price to Waste Services was the proximate cause of his alleged loss.
Alabama's Statute of Frauds, § 8-9-2, Ala.Code 1975, requires that all contracts for the sale of real property be in writing and be signed by the party against whom the contract is asserted. The writing must also contain a recital of the consideration supporting the contract. Id. "The object of the Statute of Frauds is to protect individuals from having parol agreements imposed on them against their consent; but it has been uniformly held not to defeat a parol contract which is afterwards evidenced by a writing signed by the party sought to be charged with it." Levy v. Allen, 257 Ala. 326, 58 So.2d 617 (1951).
In the present case, Pickard orally agreed to sell the land to Murray for $630,000. This agreement occurred at the October 8 meeting between Pickard, Pickard's father, Murray, Davis, and Turner. After the meeting Pickard delivered the lapsed option contract (in its corrected form) and the handwritten note (set out supra) to Turner's office. At some time after that, Pickard delivered the second handwritten note (set out supra). These documents, taken together, are sufficient to satisfy the Statute of Frauds' requirement of a writing. All three of the documents were signed by Pickard. The lapsed option contract not only recited the consideration, but also described the land, identified the parties to the contract, and contained other details of the closing. Additionally, all three of the documents evidence Pickard's intent to enter into, and to be bound by, a contract to sell the land for $630,000. As further evidence of the parties' intent to form a binding contract, after their oral contract was formed the parties immediately *1021 went to Turner's office to make arrangements for the closing. There was no substantial evidence contradicting the evidence that, at the time he bound himself to sell the land to Murray for $630,000, Pickard knew that Murray was "buying for someone else," as Pickard's father stated in his deposition. Furthermore, there was no substantial evidence that either Turner or Wilson knew any more than Pickard until after Pickard had contracted to sell the property to Murray for $630,000.
Under the undisputed facts, viewed in the light most favorable to the nonmoving party, Pickard was legally bound to convey the land to Murray for $630,000 and was so bound before Turner and Wilson learned of the details of the subsequent sale to Waste Services. Because Pickard was legally bound by his contract with Murray, he can not prove that Turner and Wilson's alleged negligence proximately caused his alleged injury. Because Pickard failed to respond with substantial evidence that Turner and Wilson's alleged acts or omissions proximately caused his alleged loss and that the transaction would have resulted differently if the alleged malpractice had not occurred, the trial court's judgment is affirmed.
AFFIRMED.
HORNSBY, C.J., and SHORES, ADAMS, STEAGALL, and INGRAM, JJ., concur.
MADDOX and HOUSTON, JJ., concur in the result.
HOUSTON, Justice (concurring in the result).
The basis of this legal malpractice action is that the lawyers for the seller of a right of redemption in certain real estate were guilty of legal malpractice, which would have occurred in 1985, preceding the enactment of any of the provisions of the Alabama Legal Services Liability Act, Ala. Code 1975, §§ 6-5-570 through 6-5-581.
Does a lawyer representing a seller of a right of redemption have an obligation to ascertain what the purchaser of that right of redemption intends to do with the property redeemed and to inform the seller of the purchaser's intent?
A lawyer has no such obligation when he or she does not represent the seller in obtaining a purchaser or setting the purchase price.
I would affirm the trial court's summary judgment for the defendant lawyers on the legal malpractice and negligence claims.
I would affirm the trial court's summary judgment for the defendant lawyers on the fraud claim based on the authority of that portion of Reeves v. Porter, 521 So.2d 963, 967-68 (Ala.1988), quoted in the majority opinion.
MADDOX, J., concurs.
NOTES
[1] Section 6-5-230 was repealed, effective January 1, 1989. 1988 Ala.Acts No. 88-441. Cf. § 6-5-248.
[2] The $1,134,000 included $850,000 as the purchase price and $42,000 as a sales commission to Emory. The remainder of the $1,134,000 was to be paid to Murray and Emory at a later date if their efforts to have the property rezoned were successful. The property was not rezoned and the actual sales price to Waste Services was $892,000.
[3] It appears that, according to their agreements, Emory received 50% of this amount, Murray received 25%, and Davis received 25%.